## J. G. WHITE & CO. v. BALL ENGINEERING CO.

(Circuit Court of Appeals, Second Circuit.   April 7, 1924.)

No. 272.

1. **United States ⟨©⟩66—Party taking over work in name of contractor held not to have become party to contract, so that seizure of property used on the work was a conversion.**

   Plaintiff, which, when a contractor for public work abandoned the contract, took over the work in the name of the contractor and carried it on with its own machinery and tools, with the knowledge of the government engineers in charge, but which was never recognized as the contractor, *held* not to have become a party to the contract, so as to authorize the government, on annulment of the contract under a provision thereof, to take possession of plaintiff's machinery, tools, and material, and such seizure was a conversion.

2. **Trover and conversion ⟨©⟩9(3)—Lessee, taking possession of property converted by lessor, with knowledge of facts, liable for conversion without demand.**

   Where defendant, on contracting for completion of a public work, leased from the government and took possession of property previously unlawfully seized by the government from plaintiff, with knowledge of such seizure and of plaintiff's claim, it became liable for the conversion, without previous demand.

In Error to the District Court of the United States for the District of Connecticut.

Action at law by the Ball Engineering Company against J. G. White & Co. Judgment for plaintiff, and defendants bring error. Affirmed.

For opinion below, see 283 Fed. 496. Certiorari denied 44 Sup. Ct. 639, 68 L. Ed. ——.

A. L. Humes, of New York City, Harry W. Reynolds, of Hartford, Conn., and J. Kemp Bartlett, of Baltimore, Md., for plaintiff in error.

Cummings & Lockwood, of Stamford, Conn. (William M. Parke, of New York City, and Charles D. Lockwood, of Stamford, Conn., of counsel), for defendant in error.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge. This writ is the latest step in a litigation now 13 years old. It grows out of a seizure by the United States of certain property used in building a lock and dam for the government, and found at the work place when the contractor defaulted, and the engineers in charge annulled his contract. Plaintiffs assert that this

property was theirs, and was neither owned by the contractor, nor leased to him. Defendants are sued for the conversion of the same, and bring this writ after judgment against them for its value, with 'many years' interest added. Judgment resulted from the lower court's decision reported in 283 Fed. 496, where reference to the lengthened earlier history of the litigation may be found.

Defendants once had judgment in their favor, which was reversed in 250 U. S. 46, 39 Sup. Ct. 393, 63 L. Ed. 835; the present record results from a new trial, and the question before us is, in substance, whether this record so differs from that before the Supreme Court as to warrant departure from the conclusion there reached on the proceedings submitted to that tribunal. The case was tried by consent without a jury and before a referee or master, whose findings, on familiar principles, have the force of a verdict. The court below accepted all the fact findings, but (differing from the referee) drew from them the conclusion of law that plaintiff was entitled to judgment.

[1] Most of the items of this story have never been doubted, and might have been agreed to years ago. The outline of the tale may be thus told, according to its legal effect. Hubbard Company contracted to build this lock in 1906. It was a small local corporation, and became unable to proceed on its own capital. The contract contained the well-known seizure clause of such government agreements. See 250 U. S. at page 53, 39 Sup. Ct. 393, 63 L. Ed. 835. When the contractor ran short, one Epps took up the work by the device of becoming a shareholder in and taking charge of Hubbard Company. Epps grew tired, and was succeeded by White Bros., and they in turn yielded to Ball; each taking over a stockholder's interest in Hubbard Company and transacting business with the government engineers as Hubbard Company. This method of carrying on was known to said engineers.

Ball procured the property in suit, used it in going forward with the work, and when in 1909 he quit work, and the United States annulled the contract (never changed from one with Hubbard Company, and never assigned nor subcontracted), the United States engineers in charge seized the property in suit, in assumed compliance with the cited contract clause. Then they advertised for bids to complete the lock and dam, and defendant was the unfortunate successful bidder. Its contract provided that, if defendant so requested, the United States would take possession of and retain said property, and defendant would be permitted to use the same in prosecuting the work, for which there would "be charged a fair rental or purchase value, to be determined by the engineer officer in charge." This contract further provided that:

"Since the ownership of the" said machines, etc., "is not free from doubt, the United States does not undertake to transfer title, does not guarantee physical possession and uninterrupted use, and will not defend any action or writ that may be instituted against the contractor concerning the same."

By this time the United States had already kept possession of the property claimed by Ball for upwards of six months; there is no finding that defendant ever "requested" its delivery, but it was delivered to defendant as lessee of the United States; and defendants used it until substantial completion of lock and dam, paying the government $380

a month therefor. When the work was done it was returned to the custody of the United States officials, in what condition (it consisted of machines and tools) does not appear. The master's report finds as facts the following:

"There was at this time (when Ball was doing work) a desire and intention on the part of Ball to undertake the execution of the work called for in said government contract (of Hubbard Company), and in pursuance of such intention and desire did, as hereinafter stated enter upon such work, and did so with the knowledge and acquiescence of said Hubbard, and with the knowledge and acquiescence of the representatives of the government of the United States in charge of said work."

"Ball during said period (i. e., his work period) acquired knowledge of the provisions of said government contract; and the master finds that said Ball acted under said government contract, and acquiesced in the provisions thereof and performed said work thereunder."

"The parties (i. e., Ball et al.) so as aforesaid actually doing the work and furnishing the materials for said lock and dam No. 6 respectively claimed and took for themselves under said government contract, through the medium of said Hubbard, the benefits and compensations accruing from the doing of said work and the furnishing of said materials. Said parties were not intermeddlers therein, and they acted in entire good faith, in undertaking the work under said government contract, and when so undertaking it they respectively intended to be bound by the terms and provisions of said contract."

This suit was begun after defendant had finished its contract, and after the property in question had been returned to the physical possession of the United States officials; that is, on January 30, 1911, the engineer in charge notified the Hubbard Company (addressing his letter to one of the Ball party, who was then president) that defendant's use of the property as the government's lessee would end on the following day, and—

"you will be given until February 28th to take possession of the same; should the machinery not be removed (by that time), such action will be taken as an indication on your part of your intention to abandon same."

Ball did nothing; but on February 3, 1911, the same officer, obeying orders from the Chief of Engineers, U. S. A., withdrew his notice. The orders from higher authority were to "retain possession of all plant till further advised by this office." There is no competent proof, as well as no finding, that defendant ever requested the United States officials to seize the property in question. It was seized and in governmental possession months before (so far as this record shows) defendant ever saw or heard of it.

Some two months before defendants made their contract, Ball in writing demanded the property, and the engineer in charge refused to give it up. That no request to seize was ever made by defendant may be safely said on this record, but it is equally plain that defendant received the property with full knowledge of Ball's demands. There is no finding, and no evidence, to show any demand on defendant, prior to suit, and when the writ issued herein, on May 17, 1911, plaintiff well knew that the property alleged to have been converted by defendant was in the possession of the United States, which intended to keep it, until further orders from the Chief of Engineers, and these orders have (so far as shown) never been given.

Thus is the question of liability now presented. The Supreme Court decision (250 U. S. 46, 39 Sup. Ct. 393, 63 L. Ed. 835) necessarily held (1) that the property in question was Ball's; (2) the mere fact that it had been used in attempting to perform the contract and was at the work place conferred no right of seizure under the cited contract clause; (3) that the governmental action was "upon request of" defendant. Whatever may be thought of the record at the time this decision was made, the present record affords no justification for the suggestion of a request by defendant, if for no other reason than (as above pointed out) that the seizure was upwards of six months old when defendant came upon the scene.

But it is now urged that the new and above-quoted findings of the master, with respect of the intent and purpose of Ball while working on the lock and dam, present a different case from that viewed by the Supreme Court. It is true that the findings of fact put very strongly Ball's purpose of acting under the contract, of abiding by the contract, and of performing the contract, if he could profitably or reasonably do it. But they do not touch the point that whatever he was doing toward performing the contract he was in part doing it with his own tools, and not as a contractor. There was no fraud in his using the corporate entity of Hubbard Company; he used that name merely as a scaffolding with which to get at his work, but he never became the contractor.

No one doubts that one may for many purposes be bound by the terms of a contract without ever being a party to it. Thus Ball, or White Bros., or Epps would undoubtedly have been bound by the contract, had they sought to recover upon it, if for no other reason than that they would have had to sue upon that contract, and none other. Unless it can be said that Ball became the contractor, so that his property could be seized and a payment therefor to the contractor would be a payment to Ball, the governmental seizure cannot be justified under the ruling decision. This is a wholly different case from that of any attempt to recover against the government on the contract, or for a quantum meruit in respect of the contract work, and Campbell v. District of Columbia, 117 U. S. 615, 6 Sup. Ct. 922, 29 L. Ed. 1007, does not apply.

It must therefore still be held that the act of taking Ball's property was a tort—i. e., a conversion wrought by the United States through the War Department; but in this litigation the United States has only appeared as amicus curiæ to demonstrate the tortious character of the sovereign's action and assert its immunity from all liability therefor. 241 Fed. 989, 154 C. C. A. 661. And see brief of Solicitor General, 250 U. S. at page 50 (39 Sup. Ct. 393, 63 L. Ed. 835)—truly an ironic amicus!

[2] It thus remains to inquire whether defendant must suffer for the conversion begotten by the United States. Though defendant did not request the seizure, which was a plain conversion, it knew about it, knew who claimed the goods in the possession of the United States, and with such knowledge became the government's lessee. It paid rent, and itself took possession of and exercised dominion over the property in question for several months. This action of the defendant was not "merely ministerial." Pollock, Torts (5th Ed.) 336. It did

not act as the servant or agent of the United States, but it made a bargain in mistaken reliance upon both the power and the faith of the United States. By such bargain it became tenant of these goods, and entitled to exclusive possession thereof so far as the United States, at least, was concerned.

But, since the taking by the lessor was unlawful, defendant was bound at its peril to recognize that possible illegality, for, even "though one may come lawfully into possession of property, if after notice of the rights of the true owner and regardless thereof dominion and ownership is asserted," there is a conversion, and demand is not a prerequisite of suit. Castle v. Corn Exchange, 75 Hun, 89, 26 N. Y. Supp. 1035, and cases cited, affirmed 148 N. Y. 122, 42 N. E. 518. See, also, for a very plain instance of conversion arising by the exercise of dominion after notice, although the original reception of the goods was without notice, Lovell v. Martin, 4 Taunt. 799.

It must therefore be held that the act of hiring these goods and becoming exclusively entitled to their possession after notice of Ball's claim constituted a conversion for which defendant was liable without demand. In fact, if we look at the origins of a case of this sort, it is trover, which is a tort; but the tort is not in the taking, but in the conversion, and "demand and refusal is only one mode of proving a conversion." Therefore when the conversion—i. e., the tort—is proven by other means, the necessity for a demand drops out. See the judgment of Ware, District Judge, in Carr v. Gale, Fed. Cas. No. 2434, 2 Ware, 330.

Plaintiff's cause of action was complete when defendant had exercised dominion over the property in dispute. The fact that after the cause of action was complete defendant no longer cared to exercise such dominion, and turned the property back to the original unsuable sovereign tort-feasor, cannot affect the right of suit and therefore the right of recovery. We express no opinion as to the details of Connecticut practice, concerning which there seems to have been much discussion in the lower court, revealed by the record, because no argument has been based upon any of those practice points.

In our opinion, it is necessary to affirm the judgment, with costs.